UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
ANTHONY POWELL,                     )
    Plaintiff              )
                           )
    v.                     )
                           )
CITY OF BOSTON; EDWARD D.           )
SIMMONS, in his individual capacity;     )      Civil Action No.
STANLEY BOGDAN, senior criminalist, in   )
his individual capacity; and JOSEPH SAIA, )
in his individual capacity; and MARGARET )
O'MALLEY, in her individual capacity,    )
                           )
    Defendants             )
_____)

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

1.    Plaintiff Anthony Powell spent twelve and a half years in prison for crimes he did not commit, including aggravated rape, kidnaping, and armed robbery. DNA testing of the rape kit finally produced indisputable evidence that exonerated Mr. Powell. On March 28, 2004, the court proclaimed his innocence and set him free.

2.    Mr. Powell's wrongful conviction resulted from unconstitutional and tortious conduct by the defendants, a Boston Police detective, a Boston Police senior criminalist, and supervisors in the Sexual Assault Unit and the Boston Police Department. It was caused by municipal policies, customs, and practices which were deliberately indifferent to the rights of the accused. The defendants caused an innocent man's conviction. Defendant Simmons used irreparably suggestive identification procedures that led the rape victim to identify Mr. Powell falsely. Defendant Bogdan created false forensic results to distort and neutralize

scientific evidence indicating that Mr. Powell was not the rapist. Defendants Saia and O'Malley failed to properly supervise police officers under their control including Simmons and Bogdan. All of the defendants were deliberately indifferent to evidence that would have exculpated Mr. Powell before trial.

3.     The Boston police had information in 1992 that a serial rapist, with a description similar to the perpetrator of the rape for which Mr. Powell was convicted, was victimizing women in Boston. After Mr. Powell's exoneration, the DNA profile of the real perpetrator was compared to forensic evidence from other unsolved rapes. The evidence matched the DNA profile in at least three other unsolved rapes – one from 1989, another rape from 1991, and one from 1999. At least one rape was committed after Mr. Powell was in prison. Because the Boston Police Department focused all of their investigative efforts on convicting Anthony Powell, they failed to apprehend the actual, serial rapist.

## JURISDICTION

4.     Title 28 U.S.C. § 1331 provides federal question jurisdiction, and 28 U.S.C. § 1367 provides supplemental jurisdiction over the state law claim.

## PARTIES

5.     Plaintiff ANTHONY POWELL is, and at all times relevant herein was, an individual residing in Boston, Massachusetts.

6.     Defendant CITY OF BOSTON is a duly organized municipal corporation under the laws of the Commonwealth of Massachusetts. At all times relevant to this action, the BOSTON POLICE DEPARTMENT, including its crime laboratory, was a department within the City of Boston.

7.    Defendant EDWARD SIMMONS, at all times relevant to this action, was a member of the Boston Police Department (BPD). His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

8.    Defendant STANLEY BOGDAN, at all times relevant to this action, was a senior criminalist working for the Boston Police Department's crime laboratory (BPD crime lab). His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

9.    Defendant JOSEPH SAIA, at all times relevant to this action, was a BPD supervisor. His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

10.    Defendant MARGARET O'MALLEY, at all times relevant to this action, was a supervisor in the BPD and commander of the Sexual Assault Unit (SAU). Her actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston. She is sued in her individual capacity.

## JURY TRIAL DEMAND

11.    Mr. Powell hereby demands a trial by jury on all issues so triable.

## FACTS

### The Crime

12.    Shortly after midnight on March 20, 1991, a young black woman, Ms. Jane Doe,[1] was forced

---

[1] In order to protect the identity of the victim, in this Complaint we refer to her only as Jane Doe (Ms. Doe) and to her boyfriend as Richard Roe.

at knife point from a bus stop at the corner of Washington and Marcella Streets in Roxbury and then beaten, raped, and robbed in the nearby woods for approximately an hour and a half by a young black man whom she had never seen before. He also stole some of her jewelry.

13.     After the rape, Ms. Doe ran to her home, which she shared with her boyfriend and his family.

14.     Ms. Doe's boyfriend, Richard Roe, summoned the police, and BPD Officer Bernard E. Green, Jr. and Officer Davin responded to their home.

15.     The police called an ambulance which transported Ms. Doe to Boston City Hospital where evidence was collected for a rape kit, including vaginal swabs and smears and combings from her pubic hair, along with sample pubic hairs taken from Ms. Doe.

16.     Defendant Sergeant Edward Simmons, a detective from the Boston Police Sexual Assault Unit, was assigned to the case.

17.     Detective Simmons visited Ms. Doe in the hospital at around 3:30 a.m. on March 20, 1991, and took a statement from her.

18.     Ms. Doe told police that her attacker was a 5-foot-10, heavy, black man, in his 20s, who was clean shaven with no facial hair, and who had black hair in a high afro on top, with a short fade on the sides and letters shaved onto the back of his scalp.

19.     Ms. Doe told police that her attacker had worn a long, blue trench coat and blue and white sneakers.

20.     Ms. Doe told police that her attacker had said he knew where she lived and threatened to harm her unless she returned with $100 to a nearby MDC skating rink at 9 p.m. the next day.

21.     Ms. Doe told police that, before the attacker left, he asked about his missing beeper.

4

22.     Some time that night, police went to the scene of the crime, and recovered a beeper, articles of Ms. Doe's clothing, and her personal papers.

**The Arrest of Anthony Powell**

23.     On the evening of March 20, 1991, Officer Paul A. MacIsaac staked out the area near the MDC skating rink. At some point shortly after 9 p.m., he saw Mr. Powell and his friend, who happened to be waiting for a bus near the intersection of Washington and MLK Streets.

24.     Officer MacIsaac stopped them and questioned them. Both men were cooperative.

25.     Officer MacIsaac admitted that Mr. Powell and his friend were not the only two black men in the area that night, and that he saw at least four or five other black males walk by him while he was questioning Mr. Powell and his friend.

26.     Officer MacIsaac took Mr. Powell into custody on an allegedly outstanding, unrelated, default warrant; however, this was a mistake because the warrant had been recalled.

27.     At the time of his arrest, on the same day as the crime, Mr. Powell did not match the victim's description because he had facial hair (a moustache) and a full head of hair with no fade or letters in the back. He was a black male within the age range she described.

28.     No physical evidence connected Mr. Powell to the crime.

**The False Identification of Anthony Powell**

29.     On information and belief, the morning after Mr. Powell's arrest, Detective Simmons and Officer Green went to Ms. Doe's house and showed her a picture of Anthony Powell.

30.     Detective Simmons claimed, in an affidavit with his application for a search warrant, that Ms. Doe identified Anthony Powell's picture from a photo array he showed her at her home.

31. In later court hearings, Detective Simmons denied that he had shown Ms. Doe photographs at her home.

**Suggestive Photo Array at the Police Station**

32. Defendant Simmons used unduly suggestive procedures to get the victim to identify an innocent man. This included using a suggestive array and making comments which led the victim to identify the plaintiff, as well as the following actions.

33. On or about the afternoon of March 21, 1991, Officer Green and Detective Simmons transported Ms. Doe from her house to the police station.

34. At the station, Detective Simmons, Officer Green and other members of the BPD were present as Detective Simmons sat with Ms. Doe and showed her approximately 10 photos.

35. Detective Simmons selected photos for the array that looked like Anthony Powell, instead of photos matching Ms. Doe's description of her attacker.

36. Anthony Powell had no prior record of sexual crimes.

37. Lieutenant Margaret O'Malley assisted Detective Simmons with the investigation into Anthony Powell as a suspect and arranging a photo array including Mr. Powell's photo.

38. Detective Simmons told Ms. Doe that her assailant's photo was in the array, and instructed her to look through the photos and to pick out the picture of the perpetrator. Ms. Doe knew at least two of the men whose photos were in the array, thus reducing the number of photographs of possible suspects.

39. The photographs did not show the back of the head.

40. After spending five to ten minutes reviewing the photographs, Ms. Doe allegedly set aside Mr. Powell's picture and kept looking through the photographs.

41.   Detective Simmons told Ms. Doe that she had "picked the right one" and told her his name.

42.   The photo of Mr. Powell in the array was 10 months old; it had been taken on May 8, 1990.

43.   Detective Simmons swore out a complaint for rape against Mr. Powell on March 21, 1991. Mr. Powell was arraigned on the rape charges on March 22, 1991.

**Other Evidence: Coat, Shoes, and Beeper**

44.   Detective Simmons obtained a search warrant and seized Mr. Powell's coat and shoes while he was in Dorchester District Court to appear on the default warrant.

45.   The coat Mr. Powell was wearing when he was arrested was black with a fur lining.

46.   Detective Simmons took Mr. Powell's coat and shoes to Ms. Doe's house on March 21, 1991. Ms. Doe told him the shoes were not the ones her attacker had worn. Ms. Doe told Detective Simmons she had never seen the coat before.

47.   On information and belief, Detective Simmons convinced Ms. Doe that the coat could have been the one worn by her attacker, as she later testified (because it smelled like urine and she had smelled urine on the rapist), although it did not fit the description she gave immediately after the rape and she had not positively identified it on the day after the rape.

48.   Neither Detective Simmons nor anyone in the BPD sent the coat to the crime lab for analysis or chemical testing or to check fibers that might have linked the coat to the crime.

49.   On information and belief, Detective Simmons either failed to search Anthony Powell's residence for the items stolen from the victim, or he conducted a search and failed to disclose the exculpatory results.

50.   The police knew that the perpetrator had lost his beeper. After a beeper was recovered from the scene, Detective Simmons took it to the BPD latent print section for examination.

51.    On information and belief, no reports were written regarding the results of the examination.

52.    On information and belief, the results of this examination were not disclosed to the prosecutor, other than Detective Simmons' courtroom testimony that, "there weren't any fingerprints to be found."

53.    Detective Simmons investigated and found that the beeper was registered to Brigham and Women's Hospital.

54.    Detective Simmons investigated whether Anthony Powell had ever worked at Brigham and Women's Hospital. When he learned that Mr. Powell had not worked there, Detective Simmons ended his investigation into who might have had access to the beeper.

**The Forensic Investigation**

55.    Assistant District Attorney Leslie O'Brien prosecuted Mr. Powell for these crimes. ADA O'Brien's practice in 1991 was to meet with all potential witnesses personally before trial so that she could make her own determination as to whether she wanted to call them at trial.

56.    ADA O'Brien relied on BPD crime lab personnel to explain to her the significance of any forensic work done in a case.

**Rape Kit: Vaginal Swabs and Smears**

57.    Senior Criminalist Stanley Bogdan examined the contents of Ms. Doe's rape kit, including smears, swabs, pubic hair combings and hair standards.

58.    Bogdan testified and wrote a report indicating that sperm cells were observed on one of the vaginal smears.

59.    Bogdan testified that he detected the presence of a substance characteristically present in semen, *i.e.*, acid phosphatase (ACP), on the two vaginal swabs.

60.    Bogdan failed to include in his report that he had a positive test result for ACP.

61.    After obtaining positive test results indicating the presence of sperm and positive test results for ACP in this case, the BPD crime lab's practice in 1991 was to perform additional ABO blood type testing on the evidence.

62.    Bogdan either failed to conduct ABO testing, or he conducted the testing but failed to write a report and suppressed the results.

63.    On information and belief, Bogdan also had sufficient evidence to conduct DNA testing or other analysis that would have provided information that would have exculpated Mr. Powell, and he intentionally failed to conduct such testing, or he conducted such testing and suppressed the results, which were exculpatory.

64.    On information and belief, Bogdan further failed to disclose the results of this testing in any form to the prosecution.

65.    Bogdan told O'Brien that subsequent tests could not verify the presence of semen on the swabs, but he failed to tell her that he had sufficient evidence to conduct additional testing.

66.    Despite having observed sperm cells and a substance characteristically present in semen, Bogdan falsely told O'Brien that he could not do further testing to establish identification.

**Rape Kit:  Pubic Hair**

67.    Bogdan examined six hairs from the rape kit that were combings from Ms. Doe's pubic region and pubic hairs known to be Ms. Doe's as a standard of the victim's hair for comparison to the combings.

68. Bogdan microscopically compared the known, standard hairs with the hairs from the combings and found that two out of six hairs were dissimilar to Ms. Doe's own pubic hairs. He wrote a report indicating this result, but he failed to date the report.

69. On November 19, 1991, Bogdan then compared these two dissimilar hairs to Anthony Powell's pubic hairs and found that they were dissimilar. He wrote a supplemental report documenting this result, but he failed to date the report.

70. Bogdan knew that obtaining information about whether the victim had had recent consensual intercourse was necessary in order to eliminate that person as the source of the semen, sperm or pubic hair.

71. Thus, on January 10, 1992, police obtained a sample of pubic hair from Ms. Doe's boyfriend, Richard Roe.

72. On January 13, 1992, Bogdan compared the two dissimilar hairs to Mr. Roe's pubic hair finding that it did not match, meaning that the dissimilar hairs presumptively came from the rapist – who was not Anthony Powell.

73. Bogdan failed to write a report documenting this result, and failed to disclose this additional exculpatory evidence to the prosecutor.

74. On March 12, 1992, ADA O'Brien sent Bogdan a letter informing him that his testimony would be necessary and that she needed to review it with him before trial.

75. After Bogdan obtained the exculpatory forensic results indicating that the pubic hair combings did not come from the victim, her boyfriend, or Anthony Powell, he allegedly conducted further testing on the same hairs and obtained "second findings" about the two pubic hairs which he originally concluded were dissimilar from the victim's, and fabricated

an explanation in order to eliminate the exculpatory impact of this evidence. Bogdan documented, but did not date, this false information in a written "supplementary report # 2."

76.    In these "second findings," Bogdan claimed that "there was hair [growing in] the pubic hair area of the alleged victim which was dissimilar to her own pubic hair."

77.    On information and belief, Bogdan met with ADA O'Brien and falsely represented the nature of his examination and failed to explain the exculpatory import of his initial findings.

78.    Defendant Bogdan falsely told ADA O'Brien that the results of the pubic hair comparisons were inconclusive rather than exculpatory of Mr. Powell.

79.    Defendant Bogdan deliberately ignored evidence that indicated Anthony Powell could not have been the rapist.

**The Police Had Information Connecting Ms. Doe's Rape To Other, Similar Rapes**

80.    At the time that Mr. Powell was wrongfully convicted of raping Ms. Doe, and after he was in custody, Boston police knew or should have known that a serial rapist, with a similar description to Ms. Doe's rapist, was using a similar modus operandi as Ms. Doe's rapist and remained at large.

81.    On or about October 1992, the BPD issued a warning to Dorchester and Mattapan residents about a rapist with the same description as the person who attacked Ms. Doe who had struck twice using a similar modus operandi (m.o.) – to wit, the suspect was described as a clean-shaven, heavily built, black man, between 20 and 30 years old, standing about 5 feet 8 to 10 inches; the rapes took place between 10pm and midnight; and the victims were approached at a bus stop by a man with a knife who assaulted the victims near an MDC skating rink.

82. The police felt that two rapes that had occurred in mid-August 1992 and mid-October 1992 were connected (one rape occurred before Powell's trial and one after he was in prison). These two rapes were committed in the same general neighborhood, less than two miles from the location of Ms. Doe's rape, with the same m.o., and by a suspect of the same description.

83. DNA testing later confirmed that a serial rapist was responsible for raping Ms. Doe and at least three other women. Because the defendants focused their attention on Mr. Powell, they failed to apprehend the actual rapist.

84. The Sexual Assault Unit tracked serial rapes in 1991 to identify patterns. Lt. Margaret O'Malley, SAU detectives, and the BPD compiled monthly summaries and reviewed a ledger book to see any discernable patterns among sexual assaults. They tracked the age, race, gender, and description of the perpetrators, geographical information, and the type of weapon used, if any. They also kept a pin dot map of the city to track sexual assaults.

**Trial, Conviction, Incarceration, and Exoneration**

85. The primary evidence presented against Mr. Powell at trial was Ms. Doe's testimony (including her in-court and photo identifications), Defendant Simmons' corroboration of the identifications, and Defendant Bogdan's forensic examination results.

86. On September 14, 1992, a jury convicted Mr. Powell of all the charges, and on October 1, 1992, the Court sentenced him to prison for twelve to twenty years for aggravated rape, five to seven years for kidnaping, five to seven years for armed robbery, and five to seven years for assault and battery with a dangerous weapon, all of which were to run concurrently.

87. After Mr. Powell's direct appeals were denied, he continued to pronounce his innocence and seek his release.

88.  In 2002, Suffolk County District Attorney Ralph Martin II consented to Mr. Powell's request for post-conviction DNA testing (to compare the rape kit DNA evidence to Powell's DNA).

89.  Cellmark Laboratories conducted DNA testing on the rape kit. The results, published in August 12, 2002, determined that Anthony Powell was excluded as the source of the DNA.

90.  However, the district attorney's office would not view the test results as conclusive until they could confirm that the DNA was not from the victim's then-boyfriend – Richard Roe.

91.  In 2004, prosecutors obtained a new DNA sample from Mr. Roe. DNA testing done by the BPD crime lab revealed that it also did not match the sample from the rape kit.

92.  Based on this DNA evidence, on March 28, 2004, the Massachusetts Superior Court granted Mr. Powell's motion for a new trial. The Commonwealth filed a Nolle Prosequi, and the Court vacated Mr. Powell's conviction. Finally, Mr. Powell walked out of prison to try to reclaim his life after having spent 12 years, six months and 17 days in prison for sexual crimes he did not commit.

93.  After Mr. Powell's exoneration, the DNA profile of the real perpetrator was compared to forensic evidence from other unsolved rapes. The evidence matched the forensic evidence collected from at least three other unsolved rapes. One rape was committed in 1989, another in 1991, and a third in 1999– at least one rape was committed after Mr. Powell was in prison.

94.  Because the defendants and the BPD focused all of their investigative efforts on convicting Anthony Powell for the rape of Ms. Doe, a serial rapist continued to victimize women in Boston and to escape punishment for his crimes.

**The Policies of the Boston Police Department Caused the Wrongful Conviction**

95.   By the time of Mr. Powell's 1991 arrest, policymakers for the Boston Police Department were on notice of misconduct by Boston police officers including officers' providing false testimony, filing false affidavits in support of search warrants, failing to disclose Brady material, and inadequately investigating cases. Although this misconduct deprived people of their constitutional rights, the policymakers for the Boston Police Department neither required its officers to comply with the law nor punished them when they did not comply.

96.   At the time of Mr. Powell's arrest, the Boston Police Department had no policy for disciplining police officers who failed to turn over exculpatory evidence.

97.   At the time of Mr. Powell's arrest, the Boston Police Department did not have a properly functioning system of internal discipline. The police department was such a public disgrace that Mayor Flynn appointed a management review committee headed by attorney James D. St. Clair to review the department. The committee issued its report on January 14, 1992, finding wide-ranging problems with the internal disciplinary system. The systemic failures at the time of the rape are described below.

98.   The investigation of Ms. Doe's rape took place at a time when the Boston Police Department was so poorly managed that police officers felt free to use false statements in search warrants and to coerce witnesses to lie in support of arrests. In February 1989, criminal defense attorneys in Commonwealth v. Lewin revealed that police officers in the Drug Control Unit lied in affidavits to obtain search warrants.

99.   On October 13, 1989, Shawn Drumgold was convicted of a 1988 murder. He spent 15 years in prison before his conviction was overturned. Police failed to disclose that a key witness

14

was suffering from a brain tumor that caused severe memory loss, and that they gave another witness free housing, food and money, as well as wiped clean his criminal record, in exchange for his testimony against Drumgold. This witness later admitted his testimony was not true.

100. In 1989, Marvin Mitchell was charged with a rape although he did not fit the description given by the victim. He was convicted on January 23, 1990. Two Boston police officers falsely testified that Mr. Mitchell had admitted to wearing unusual clothing described by the victim. After spending over seven years in prison, Mr. Mitchell was exonerated in April 1997 through DNA testing. The Boston police officers were not disciplined.

101. Also in 1989, Neil Miller was wrongfully identified and charged with a rape he did not commit. Police arranged a suggestive identification focusing on Miller as their suspect, although he, like Powell, had no prior record of sexual crimes. Police had connected the rape with which Miller was charged to two other rapes that Miller could not have committed. Rather than turning over this exculpatory evidence, police buried it in order to secure a conviction. BPD crime lab personnel falsely told the prosecutor that serology results which had no evidentiary value were inculpatory. He was convicted in December 1990.

102. Also in 1989, Superior Court Judge Elizabeth A. Porada chastised Boston Police Officer Trent Holland for blatantly fabricating testimony, in which he claimed to have witnessed a drug deal while looking across an empty field where in fact a large building stood, and she recommended that Holland be the subject of an "official investigation." Then-Suffolk County District Attorney Newman A. Flanagan appointed officers to investigate Holland for possible perjury, but the investigation did not result in any discipline of Holland.

15

103.    On October 23, 1989, Carol Stuart was murdered in Boston. Her husband, Charles, told officers that a black man fired the shot. Boston police officers focused their murder investigation on an African-American man named Willie Bennett. Only after Mr. Stuart committed suicide and evidence arose showing that he was the murderer did the investigators end their pursuit of Mr. Bennett. The United States Attorney for the District of Massachusetts investigated this criminal investigation. In a report dated July 10, 1991, the United States Attorney found that Boston police officers, including but not limited to Holland, engaged in the following conduct to incriminate Mr. Bennett:

A.      Forcing witnesses to give false statements incriminating Mr. Bennett;

B.      Pressuring witnesses to give false testimony incriminating Mr. Bennett to a Suffolk County grand jury investigating the murder; and

C.      Pressuring witnesses to give false information that was used to obtain search warrants.

104.    In 1989 and beyond, the BPD failed to effectively discipline Holland despite allegations of a pattern of lies. Rather than being prosecuted, Holland was later promoted. None of the officers mentioned in the U.S. Attorney's report were disciplined.

105.    Before the incidents leading to the wrongful arrest and conviction of Mr. Powell, the policymaker for the Boston Police Department, Boston Police Commissioner Francis Roache, was on notice that Boston police officers felt free to falsify affidavits in support of search warrants and to testify falsely to grand juries and at criminal trials.

106.    Despite knowledge that Boston police officers felt free to circumvent the law to secure convictions, the Boston Police Department:

16

    A.     Failed to require an adequate standard of investigation by its detectives;

    B.     Failed to properly supervise and review the method and process of criminal investigations; and

    C.     Failed to discipline Boston police officers for giving false testimony.

107.    The Boston Police Department failed to hold its officers to any ethical standard. This created an environment in which officers like Defendant Simmons felt free to conduct a suggestive identification, and to misrepresent facts in order to obtain a conviction because he knew this conduct would not result in punishment. The Boston Police Department allowed its officers to feel that arresting and convicting someone for a crime was more important than making sure that the person arrested and convicted actually committed the crime.

109.    Boston Police Superintendent Paul Joyce has acknowledged that, during the time period of Mr. Powell's arrest, prosecution, and incarceration, "On the issue of wrongful convictions, there were really systemic issues. The police were part of that."

108.    The BPD's problems continued throughout the 1990s. In 2004, the fingerprint lab was shut down and the BPD conducted a massive restructuring of the department's forensics teams, changed investigative procedures, including retraining officers in new eye witness-identification techniques, and removed Detective Daniel Keeler from the homicide unit after he admitting to lying in his reports and failing to collect important evidence at a crime scene.

**Damages**

109.    At the time of his release, Mr. Powell had spent one third of his life in prison for a crime he did not commit.

110. Perceived as a "teenage rapist," Mr. Powell suffered harassment and attacks from his fellow inmates and correctional officers while imprisoned.

111. The Massachusetts Parole Board denied Mr. Powell parole several times because he maintained his innocence. For example, on April 17, 2002, the Parole Board denied Mr. Powell parole because he was a "convicted sex offender not in treatment."

112. Even after the August 2002 tests had showed Anthony Powell was excluded as the source of the DNA from the rape kit, on May 12, 2003, the Parole Board nevertheless again denied Mr. Powell parole because he was a "convicted sex offender not in treatment," he had disciplinary issues, and he was "involved with [an] appeal process."

113. Just a few weeks before he regained his freedom, Mr. Powell lost his grandmother – the woman who had helped raise him and who had fought relentlessly to gain his freedom – when she died in a tragic house fire.

114. Working temporary jobs, Mr. Powell spent his first months of freedom in a homeless shelter.

115. Mr. Powell is currently working construction as a union carpenter, trying to rebuild his life.

116. Mr. Powell continues to suffer the physical and mental effects of having been wrongfully accused and convicted.

117. As a direct result of the defendants' unconstitutional actions, Mr. Powell sustained the following injuries and damages: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom, such as diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic

opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

### Count I—42 U.S.C. § 1983
### Claim against Defendant Simmons
### for Unduly Suggestive Identification Procedures

118.    Plaintiff Powell hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

119.    Defendant Simmons conducted improper, unduly suggestive identification procedures and wrongfully pressured the rape victim into falsely identifying Mr. Powell as her rapist.

120.    Defendant Simmons deliberately and recklessly suggested to Ms. Roe that Mr. Powell was her attacker and impermissibly reinforced her certainty after selecting his photo.

121.    Defendant Simmons committed these unduly suggestive acts intentionally and with deliberate indifference to Mr. Powell's clearly established constitutional rights. No reasonable officer would have believed that these procedures were lawful or would produce a reliable identification.

122.    When Mr. Powell was arrested for rape, the only inculpatory evidence was the unreliable identification by Ms. Doe, which was the result of police pressure rather than her own memory. Because the victim's identification was the result of undue pressure, it did not provide probable cause to arrest him.

123.    As a direct and proximate result of the defendants' use of unduly suggestive identification procedures, Ms. Doe misidentified Mr. Powell at trial in violation of his clearly established Fourth, Fifth, Sixth, and Fourteenth Amendment rights to a fair trial and not to be deprived of liberty without due process of law. Mr. Powell suffered more than twelve and a half years

19

of wrongful imprisonment, and he endured all of the other physical, emotional, and pecuniary

damages set forth above.

### Count II—42 U.S.C. § 1983
### Claims against Defendants Simmons, Bogdan, and O'Malley
### for Failing to Disclose Evidence and for Falsifying Evidence

124.   Plaintiff Powell hereby incorporates fully all of the foregoing as if set forth herein and further

alleges as follows:

125.   Defendants Simmons and Bogdan made material omissions and misrepresentations that

contributed to the erroneous prosecution and conviction of Mr. Powell.

126.   Defendant Simmons deliberately and recklessly proceeded against Mr. Powell by falsely

arresting him, coercing Ms. Doe's inculpatory testimony, and participating in his prosecution.

127.   Defendants Simmons and O'Malley had several reasons for believing Ms. Doe was mistaken

in her identification and that therefore probable cause to arrest Mr. Powell was lacking.

128.   Defendants Simmons and O'Malley failed to disclose to the prosecutor material information

that was favorable to Mr. Powell, including but not limited to: (1) the fact that Simmons

repeatedly employed unduly suggestive conduct that induced Ms. Doe to misidentify Mr.

Powell, and (2) that police had connected several other rapes with the same modus operandi

as Ms Doe's rape – at least one of which could not have been committed by Mr. Powell.

129.   Defendant Bogdan falsified his results regarding the pubic hair combings after his

examination revealed that the hairs did not match Anthony Powell's hair.

130.   Defendant Bogdan created a false supplemental report to distort, and thus withhold, the

scientific import of material forensic hair evidence that presumptively exculpated Mr. Powell

20

in the rape, *i.e.*, that pubic hair combings from the rape kit were dissimilar to the victim and dissimilar to Mr. Powell, and presumptively came from the rapist.

131.  Defendant Bogdan failed to disclose material exculpatory evidence, including that the victim's boyfriend's pubic hair also was found to be dissimilar to the combings in the rape kit – forensic hair evidence that also pointed to the exclusion of Mr. Powell as the rapist.

132.  Bogdan, an expert forensic examiner, acted in an investigatory fashion when he interpreted and documental physical evidence.

133.  Although the crime lab's practice in 1991 was to perform ABO blood type testing after obtaining two positive test results, after obtaining positive tests indicating the presence of sperm and positive test results for ACP, on information and belief, Defendant Bogdan deliberately recklessly, and/or intentionally failed to conduct ABO testing, or he conducted such testing but deliberately failed to document the exculpatory results, and intentionally suppressed them.

134.  On information and belief, Bogdan also had sufficient evidence to conduct DNA testing or other analysis which would have provided information exculpatory to Mr. Powell, and he deliberately, recklessly, and/or intentionally failed to conduct such testing, or he conducted such testing and failed to disclose the exculpatory results to the prosecution.

135.  As a direct and proximate result of Defendant Bogdan's fabrication, Mr. Powell was wrongfully convicted and suffered the injuries and damages described above.

136.  Acting with deliberate indifference to Mr. Powell's innocence, including by withholding material exculpatory and impeachment evidence prior to trial, Defendants Simmons, Bogdan, and O'Malley violated Mr. Powell's clearly established rights under the Fourth, Fifth, and

Fourteenth Amendments to due process of law as interpreted by the United States Supreme Court in <u>Brady v. Maryland</u> and its progeny. This directly and proximately caused Mr. Powell to be wrongfully convicted and to suffer the injuries and damages described above.

**Count III—42 U.S.C. § 1983**
**Supervisory Liability Claims against Joseph Saia and Margaret O'Malley,**
**Supervisors in the Boston Police Department**

137.    Plaintiff Anthony Powell hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

138.    Joseph Saia, a supervisor of the Boston Police Department and Margaret O'Malley, head of the Sexual Assault Unit, acted with deliberate indifference to the rights of criminal suspects, failed adequately to train and supervise Defendants Simmons and Bogdan. In so doing, they tacitly acquiesced in, condoned, or encouraged the individual defendants' engaging in unconstitutional misconduct, including the use of unduly suggestive identification procedures, the fabrication of evidence, and the failure to provide exculpatory evidence to the prosecutor.

139.    The failure of Defendants Saia and O'Malley to supervise and train Defendants Simmons and Bogdan amounted to deliberate indifference, or intentional misconduct, which proximately and directly caused Mr. Powell to suffer all of the injuries and damages set forth above.

**Count IV—42 U.S.C. § 1983**
**<u>Monell</u> Claim against the City of Boston**

140.    Plaintiff Powell hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

141.    By March 1991, when Mr. Powell was arrested and prosecuted, Defendant City of Boston

had a policy, custom, or practice of failing to properly discipline, supervise, and train Boston

police officers including the individuals named in this case. The City failed to ensure that its

police officers would conduct constitutionally adequate identification procedures; obtain

probable cause to ensure that suspects would not be falsely arrested and maliciously

prosecuted; disclose to prosecutors material information favorable to criminal defendants;

and follow the duties imposed by <u>Brady v. Maryland</u> in dealing with exculpatory evidence.

142.    The City of Boston had a custom of using overly suggestive identification procedures and

failing fully to disclose the procedures used to the prosecutor.

143.    The City of Boston had a pattern of failing to train and supervise the Sexual Assault Unit in

effectively reviewing for patterns of crimes involving similar modus operandi, similar

descriptions of assailants, and serial rapists.

144.    The City of Boston had a pattern of disregarding similarities and burying exculpatory

evidence after making connections between different rapes when such evidence tended to

exculpate a suspect against whom proceedings had already begun.

145.    These policies, customs, and practices led Boston police officers to believe that misconduct

would be tolerated and that allegations of abuse of constitutional rights would not be

investigated. They made it foreseeable that officers would violate people's constitutional

rights.

146.    The policies, customs, and practices of the Boston Police Department described in this

complaint were the moving force behind Mr. Powell's arrest, prosecution, and incarceration.

161.    The polices, customs and practices of the City of Boston proximately and directly caused Mr. Powell to suffer all of the injuries and damages set forth above.

**Count V—State Tort Law
Claim against Defendant Simmons
for Malicious Prosecution**

147.    Plaintiff Powell hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

148.    Defendant Simmons commenced or caused to be commenced a criminal prosecution against Mr. Powell, acting with malice and without probable cause. He used improper and unduly suggestive techniques and wrongfully pressured Ms. Doe into falsely identifying Mr. Powell as her rapist.

149.    The criminal action ultimately terminated in Mr. Powell's favor on March 28, 2004, when his conviction was vacated on the grounds of actual innocence, due to the conclusive comparative DNA exoneration.

150.    As a proximate result of the defendant's conduct, Mr. Powell was arrested, prosecuted, forced to endure an unfair trial and wrongful conviction, and wrongly imprisoned for more than ten years. He suffered the injuries and damages set forth above.


**WHEREFORE,** Anthony Powell prays as follows:

A.    That the court enter judgment in favor of Mr. Powell and against the defendants on all Counts of the Complaint;

B.    That the court award compensatory damages to Mr. Powell and against the defendants, jointly and severally, in an amount to be determined at trial;

24

C.    That the court award punitive damages to Mr. Powell and against the non-municipal defendants, jointly and severally, in an amount to be determined at trial, in order that such an award will deter similar proscribed conduct in the future;

D.    That the court award to Mr. Powell and against the defendants, jointly and severally, pre-judgment interest on all sums awarded him in this action;

E.    That the court award to Mr. Powell and against the defendants, jointly and severally, recovery of his costs concerning this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

F.    That the court grant Mr. Powell any such other relief to which he may be entitled.


**RESPECTFULLY SUBMITTED,**
Anthony Powell
By his attorneys,


/s/ Howard Friedman
_____
Howard Friedman
BBO #180080
Jennifer L. Bills
BBO #652223
**Law Offices of Howard Friedman, P.C.**
90 Canal Street, 5th Floor
Boston, MA 02114-2022
Tel: (617) 742-4100
Fax: (617) 742-5858

Dated: March 22, 2007